# United States Court of Appeals for the Federal Circuit

---

**SUPREMA, INC. AND MENTALIX, INC.,**
*Appellants,*

**v.**

**INTERNATIONAL TRADE COMMISSION**,
*Appellee,*

**AND**

**CROSS MATCH TECHNOLOGIES, INC.,**
*Intervenor.*

---

2012-1170

---

On appeal from the United States International Trade Commission in Investigation No. 337-TA-720.

- - - - - - - - - - - - - - - - - - - - - -

**CROSS MATCH TECHNOLOGIES, INC.,**
*Appellant,*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

**AND**

**SUPREMA, INC.** AND **MENTALIX, INC.,**
*Intervenors.*

————————————

2012-1026, -1124

————————————

On appeal from the United States International Trade Commission in Investigation No. 337-TA-720.

————————————

Decided:  December 13, 2013

————————————

DARRYL M. WOO, Fenwick & West, LLP, of San Francisco, California, argued for appellants Suprema, Inc., et al.  With him on the brief were HEATHER N. MEWES, JAE WON SONG, ILANA S. RUBEL, BRYAN A. KOHM, DAVID M. LACY KUSTERS and ERIN SIMON.

CLINT A. GERDINE, Attorney, Office of General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee.  With him on the brief were DOMINIC L. BIANCHI, Acting General Counsel, and ANDREA C. CASSON, Assistant General Counsel for Litigation.

MAXIMILIAN A. GRANT, Latham & Watkins LLP, of Washington, DC, argued for intervenor Cross Match Technologies, Inc.  With her on the brief were GABRIEL K. BELL, MICHAEL A. DAVID and GREGORY K. SOBOLSKI.  Of counsel on the brief was CLEMENT J. NAPLES, of New York, New York.

DARYL JOSEFFER, King & Spalding LLP, of Washington, DC, for amicus curiae. With him on the brief was ADAM CONRAD.

————————

MAXIMILIAN A. GRANT, Latham & Watkins LLP, of Washington, DC, argued for appellant Cross Match Technologies, Inc. With her on the brief were MICHAEL A. DAVID and GABRIEL K. BELL. Of counsel on the brief was CLEMENT J. NAPLES, of New York, New York.

CLINT A. GERDINE, Attorney, Office of General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were DOMINIC L. BIANCHI, Acting General Counsel, and ANDREA C. CASSON, Assistant General Counsel for Litigation.

DARRYL M. WOO, Fenwick & West, LLP, of San Francisco, California, argued for intervenors Suprema, Inc., et al. With him on the brief were JAE WON SONG, ILANA S. RUBEL, BRYAN A. KOHM, DAVID M. LACY KUSTERS. Of counsel was HEATHER N. MEWES.

————————

Before PROST, O'MALLEY, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* REYNA.

O'MALLEY, *Circuit Judge*.

We address related appeals from rulings of the U.S. International Trade Commission ("the Commission").

First, we consider the propriety of the Commission's limited exclusion order barring importation of optical

scanning devices and a related cease and desist order. We vacate the cease and desist order, vacate the limited exclusion order in part, and remand so that the order can be revised to bar only a subset of the scanners at issue. Resolution of this appeal turns in part on our conclusion that an exclusion order based on a violation of 19 U.S.C. § 1337(a)(1)(B)(i) may not be predicated on a theory of induced infringement under 35 U.S.C. § 271(b) where direct infringement does not occur until *after* importation of the articles the exclusion order would bar. The Commission's authority under § 1337(a)(1)(B)(i) reaches "articles that . . . infringe a valid and enforceable United States patent" at the time of importation. Because there can be no induced infringement unless there has been an act of direct infringement, however, there are no "articles . . . that infringe" at the time of importation when direct infringement has yet to occur. The Commission's exclusion order must be revised, accordingly, to bar only those articles that infringe a claim or claims of an asserted patent at the time of importation.

Next, we consider a Commission order refusing to find a violation of § 337 with respect to some of the same optical scanners. The proceeding giving rise to that appeal was premised on alleged infringement of U.S. Patent No. 7,277,562 ("the '562 patent"), a different patent than the two patents at issue in the first appeal we address today. The Commission concluded that the scanners at issue did not infringe the asserted claims of the '562 patent when properly construed. Because we agree with the Commission's claim construction and non-infringement finding, we affirm the Commission's ruling in this related appeal.

## I.

## A.

The Commission rulings before us arise from proceedings in which Cross Match Technologies, Inc. ("Cross Match") asserts that Suprema, Inc. and Mentalix, Inc. violated 19 U.S.C. § 1337(a)(1)(B)(i) by importing articles that infringe or are used to infringe U.S. Patent Nos. 7,203,344 ("the '344 patent"), 7,277,562 ("the '562 patent"), and 5,900,993 ("the '993 patent"). The Commission found that Mentalix directly infringed method claim 19 of the '344 patent by using its own software with imported Suprema scanners and found that Suprema induced that infringement. The Commission also found that certain of Suprema's imported optical scanners directly infringe claims 10, 12, and 15 of the '993 patent. But the Commission found no infringement of the '562 patent. The Commission then held that Suprema and Mentalix failed to prove that the '993 patent was invalid as obvious over two prior art patents: U.S. Patent No. 3,619,060 ("the '060 patent") and U.S. Patent No. 5,615,051 ("the '051 patent"). Based on these findings, on October 24, 2011, the Commission issued a limited exclusion order directed to certain scanning devices imported "by or on behalf of Suprema or Mentalix" and issued a cease and desist order directed to Mentalix only.

Suprema and Mentalix premised their appeal of the exclusion and cease and desist orders on their belief that the Commission erred because: (1) a § 337(a)(1)(B)(i) violation may not be predicated on a theory of induced infringement under the facts of this case; (2) Suprema was not willfully blind to the existence of the '344 patent and, thus, did not induce infringement of that patent; (3) Mentalix did not directly infringe the '344 patent; (4) Suprema's scanners do not infringe the '993 patent under the correct claim construction; and (5) the asserted claims

of the '993 patent were invalid as obvious. Cross Match, in turn, appeals the Commission's non-infringement ruling with respect to the '562 patent, challenging the claim construction upon which that ruling was based.

We vacate the infringement finding on the '344 patent because we hold that an exclusion order based on a violation of § 337(a)(1)(B)(i) may not be predicated on a theory of induced infringement where no direct infringement occurs until post-importation. Given this conclusion, we do not reach the merits of the Commission's willful blindness or direct infringement findings on the '344 patent. Regarding the '993 patent, we affirm the Commission's finding of infringement and conclusion that Suprema failed to prove that the asserted claims were invalid as obvious. Finally, we affirm the Commission's non-infringement ruling regarding the '562 patent.

## B.

The technology at issue pertains to biometrics (i.e., the science of analyzing biological characteristics) and the scanning of biometric objects. This case specifically involves fingerprint scanners. Fingerprint capture and recognition, probably the most common form of biometrics, is important technology because many industries and law enforcement increasingly rely on fingerprints as biometrics to store, recognize, or verify identity.

## C.

As explained above, these appeals concern three patents. Two are method patents, the '344 patent and the '562 patent. The '344 patent is at issue in the appeal by Suprema and Mentalix; the '562 patent is at issue in Cross Match's appeal. They relate to particular implementations of fingerprint image capture and processing. The third patent, the '993 patent, contains apparatus

claims (over an "optical system") and is at issue in Suprema's appeal.

The '344 patent contains claims drawn to methods used by an optical scanning system to detect fingerprint images based on shape and area, and to determine fingerprint quality based on the detected shape and area. '344 patent col. 19 ll. 24–38. Claim 19 (the only claim of the '344 patent found infringed) recites such a process:

> A method for capturing and processing a fingerprint image, the method comprising:
>
> > (a) scanning one or more fingers;
> >
> > (b) capturing data representing a corresponding fingerprint area;
> >
> > (c) filtering the fingerprint image;
> >
> > (d) binarizing the filtered fingerprint image;
> >
> > (e) detecting a fingerprint area based on a concentration of black pixels in the binarized fingerprint image;
> >
> > (f) detecting a fingerprint shape based on an arrangement of the concentrated black pixels in an oval-like shape in the binarized fingerprint image; and
> >
> > (g) determining whether the detected fingerprint area and shape are of acceptable quality.

*Id.* col. 19 ll. 24–37.

The '993 patent claims an optical system for forming a real image of a biometric object that corrects for field curvature using a three-lens system. Claims 10, 12, and

15 were found infringed. Claims 12 and 15 depend from claim 10. The three claims read:

10. An optical system having an optical axis, said system forming an image of an object and comprising:

a) a prism having a first surface for contacting the object and a second surface, said first surface being oriented with respect to the optical axis at an angle greater than the angle of total internal reflection of the surface;

b) an aperture stop;

c) a first lens unit having a positive power between the aperture stop and the prism for forming a telecentric entrance pupil;

d) a second lens unit having a positive power for forming a real image of the object, said second lens unit being on the image side of the first lens unit; and

e) a third lens unit for correcting the field curvature of the image contributed by the first and second lens units.

12. The optical system of claim 10 wherein the first lens units consist of a single lens element.

15. The optical system of claim 10 wherein the third lens unit has a negative power.

'993 patent col. 10 ll. 18–45. The debate over the '993 patent centers on whether the optical system described in claim 10 can include within it non-lens elements, such as the mirrors that are included in the lens units of the Suprema scanners. While Suprema says claim 10 and those claims that depend therefrom exclude the use of

such mirrors, the ALJ and the Commission found they did not.

The '562 patent claims methods aimed at "reliably capturing print images." The parties' dispute regarding the '562 patent centers on an issue of claim construction—in particular, the determination by the ALJ and Commission that "capture," within the meaning of the asserted claims, cannot occur until after the print quality and number of prints have been determined and detected.

## D.

Cross Match, the complainant and intervenor, is a global provider of fingerprint acquisition technology. It is a domestic company headquartered in Florida, and it develops and manufactures a variety of biometric identification products for verifying a person's identity, such as fingerprint and palm print scanners. It supplies products to the U.S. government and private industry. Cross Match is the sole assignee of the three patents-in-suit.

The respondents below are Suprema, a Korean company that manufactures and imports hardware and software for scanning fingerprints, and Mentalix, a domestic importer of Suprema scanners. Specifically at issue are Suprema scanners marketed under the trade-name RealScan and software development kits ("SDKs") packaged along with those scanners. Mentalix imports Suprema's scanners and integrates them with its own software in the United States. The specific Mentalix software involved in this case is called FedSubmit. Mentalix's accused software can be used with fingerprint scanners sold by other companies, including Cross Match. In the Commission investigation, Cross Match contended that its system claims are infringed by Suprema optical systems and that the method claims at issue are infringed when Suprema's scanners are used in combination with

both respondents' software (i.e., Suprema's SDKs and FedSubmit).

E.

Suprema appeals the Commission's finding that it violated § 337(a)(1)(B)(i) by infringement of the '344 and '993 patents, and asks that the related exclusion orders be vacated. The ALJ found that a number of Suprema's scanners (RealScan-10, RealScan-D, RealScan-10F, and RealScan-DF), when used with Mentalix's FedSubmit software, directly infringe claim 19 of the '344 patent and recommended an exclusion order relating to those scanners on that ground. The Commission agreed that the '344 patent was infringed, but clarified the controlling infringement theories—it concluded that Mentalix directly infringes method claim 19 of the '344 patent when it combines Suprema products with its own software and that Suprema induces that infringement.

While the ALJ had not considered inducement and made no factual finding on its elements, the Commission nevertheless concluded that the record evidence supported a finding that Suprema (1) was willfully blind to the '344 patent, (2) studied and emulated Cross Match's products before willfully blinding itself to the infringing nature of Mentalix's activities, and (3) actively encouraged those activities. Therefore, it found that Suprema had induced infringement of the patented method under 35 U.S.C. § 271(b), and that this inducement formed the basis for a § 337(a)(1)(B)(i) violation.

Regarding the underlying direct infringement, the Commission found that Mentalix's FedSubmit software, when integrated with the imported Suprema scanners, and upon execution of the software, practiced method claim 19 of the '344 patent under the ALJ's claim con-

structions.[1]  The Commission adopted those constructions and the subsequent infringement findings.

With respect to the '993 patent, the Commission fully adopted the ALJ's infringement analysis.  Specifically, the Commission found that the claimed optical systems need not exclude non-lens elements (such as distortion correcting prisms or holographic optical elements) or off-axis optics.  The Commission then concluded that all the recited elements of claims 10, 12, and 15 were met by the accused scanners.

The Commission also found that the asserted prior art, the '060 and '051 patents, did not render the asserted claims of the '993 patent obvious.  Based on the evidentiary record, the ALJ determined that the respondents failed to offer clear and convincing evidence that the combination of the '060 and '051 patents renders asserted independent claim 10, as well as asserted dependent claims 11–12, 15, and 17–18, obvious under § 103(a).  The ALJ concluded that the '060 patent did not disclose element 10(c) (a first lens unit having a positive power between the aperture stop and the prism for forming a telecentric entrance pupil), element 10(d) (a second lens unit having a positive power for forming a real image of the object), or element 10(e) (a third lens unit for correcting field curvature).  The ALJ also noted that, although

---

[1]  Although the Commission says that Mentalix conceded that it directly infringed claim 19, Mentalix contests that statement and points to places in the record where it denied that it practiced the asserted method.  We see no support in the record for the Commission's characterization of Mentalix's position, but need not address it further since we vacate the only Commission order directed to Mentalix on other grounds.

the '051 patent disclosed a triplet lens that was well suited for use with photographic cameras, the patent did not pertain to fingerprint scanners and did not disclose a telecentric condition. The ALJ also found no motivation to combine the two references. The Commission adopted each of these findings.

## F.

In its separate appeal, Cross Match challenges the Commission's determination that claims 1, 5–7, 12, and 30 of the '562 patent are not infringed by either Suprema's scanners or use of those scanners in conjunction with the FedSubmit software. The ALJ adopted Cross Match's proposed construction of "capture" as it appears in step (f) of the asserted independent claims, namely, that "capture" means "acquiring, by the scanner, for processing or storage." The Commission adopted that construction and, based on it, also adopted the ALJ's finding that the accused products do not infringe the asserted claims.

Specifically, the Commission found that the "capture" limitation was not met because the record evidence showed that the accused scanners do not perform the steps of claim 1 in the required order. The Commission found that Claim 1 requires that the scanned fingerprint image be captured after both a determination of the expected number of prints under step (e) and a determination of the quality of the prints under step (d) have been made. But the accused products capture the fingerprint image before software determines the number of prints as required by step (e) and before assessing their quality as required by step (d). The Commission also found the accused products do not perform step (f) of claim 30, since that step is substantially the same as step (f) of claim 1.

## II.

We turn first to Suprema's appeal regarding the '344 patent and the threshold issue it raises—specifically, whether a § 337(a)(1)(B)(i) violation may be predicated on a claim of induced infringement where the attendant direct infringement of the claimed method does not occur until post-importation. We conclude that § 337(a)(1)(B)(i), by tying the Commission's authority to the importation, sale for importation, or sale within the U.S. after importation of *articles that infringe* a valid and enforceable U.S. patent, leaves the Commission powerless to remedy acts of induced infringement in these circumstances. Accordingly, we vacate the Commission's rulings regarding the '344 patent.[2]

## A.

On appeal, Suprema contends it does not import "articles that infringe," as required under § 337(a)(1)(B)(i). The accused devices are imported scanners which Cross Match concedes do not directly infringe the method of claim 19 of the '344 patent at the time of importation. The alleged infringement only takes place when the scanners are combined with domestically developed software after the scanners are imported. Cross Match

[2] Our ruling is not a jurisdictional one. The question we address is not whether the Commission may initiate an investigation where theories of induced infringement are implicated; we simply conclude that a § 337(a)(1)(B)(i) violation may not be predicated on a theory of induced infringement in these circumstances. *See Amgen, Inc. v. U.S. Int'l Trade Comm'n,* 902 F.2d 1532, 1535 (Fed. Cir. 1990) (noting that the Commission is correct to first assume jurisdiction and then determine merits of claim where patent claims are asserted).

does not dispute that the scanners have substantial non-infringing uses, and Suprema contends its other customers have put them to such uses. On these facts, Suprema contends that no infringing articles were ever imported. Accordingly, Suprema asserts that the Commission's decision with respect to the '344 patent must be vacated.

Suprema argues that allegations of induced infringement do not adequately connect the fact of importation to the ultimate infringement. Suprema concedes that, if an article is capable of no non-infringing uses, its importation may constitute contributory infringement and thereby violate § 337. But, Suprema asserts that the imported scanners at issue here are capable of multiple non-infringing uses. It is only when they are combined with Mentalix's specific software program that they purportedly infringe the method described in claim 19. Suprema believes that § 337(a)(1)(B)(i) does not reach the conduct in which Cross Match alleges it engaged.

Cross Match defends the Commission's ruling that, by inducing Mentalix to commit direct infringement, Suprema violated § 337(a)(1)(B)(i). Cross Match argues that *In the Matter of Certain Electronic Devices*, Inv. No. 337-TA-724, 2012 WL 3246515, at *8–9 (ITC Dec. 21, 2011), a recent Commission ruling, makes clear that a § 337 violation *can be* predicated on the theory of induced infringement the Commission employed here. Cross Match also relies on our rulings in *Kyocera Wireless Corp. v. International Trade Commission* 545 F.3d 1340 (Fed. Cir. 2008), and *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed. Cir. 2003).

The Commission disputes Suprema's argument regarding the scope of its authority under § 337(a)(1)(B)(i). According to the Commission, "articles that . . . infringe" can involve any type of infringement, be it direct, contributory, or induced. The Commission asserts that Suprema

began encouraging and aiding and abetting Mentalix's infringement well before importation, indicating that Suprema already was indirectly infringing at the time of importation. The Commission also cites *Certain Electronic Devices*, which, in its view, did not change the law and simply reiterated that all forms of indirect infringement can lead to a violation of § 337(a)(1)(B)(i).

B.

The Commission's authority to issue exclusion orders in this case must find a basis in statute. *See Kyocera*, 545 F.3d at 1355 ("The ITC is a creature of statute, and must find authority for its actions in its enabling statute."). The question presented is, thus, one of statutory construction. When interpreting a statute which an agency administers, we conduct our statutory analysis under the framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under that framework, "a reviewing court must first ask 'whether Congress has directly spoken to the precise question at issue.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 842). "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron*, 467 U.S. at 843). If, however, "the statute in question is ambiguous and the agency's interpretation is reasonable," "a court must defer to an agency's construction of a statute governing agency conduct." *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352, 1361 (Fed. Cir. 2005).

All matters of statutory construction, of course, begin with the language of the statute in question. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction, our analysis begins

with the language of the statute.") (internal quotation marks omitted).  Section 337 states:

> (1)  Subject to paragraph (2), the following are un-lawful, and when found by the Commission to ex-ist shall be dealt with, in addition to any other provision of law, as provided in this section:
>
> . . .
>
> (B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of *articles that—*
>
> > (i)  *infringe* a valid and enforceable Unit-ed States patent or a valid and enforceable United States copyright registered under Title 17; or

19 U.S.C. § 1337(a) (emphases added).  The Commission's mandate to deal with matters of patent infringement under § 337(a)(1)(B)(i) is thus premised on the "importa-tion," "sale for importation," or "sale within the United States after importation" of "articles that . . . infringe." *Id.*  Thus, the Commission's authority extends to "articles that . . . infringe a valid and enforceable United States patent."  The focus is on the infringing nature of the articles at the time of importation, not on the intent of the parties with respect to the imported goods.

The same focus is evident also from the main remedy it can grant, exclusion orders on the imported articles:

> (d) Exclusion of articles from entry
>
> (1) If the Commission determines, as a result of an investigation under this section, that there is a vi-olation of this section, it shall direct that *the arti-cles concerned*, imported by any person violating

the provision of this section, be excluded from entry into the United States, unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry. The Commission shall notify the Secretary of the Treasury of its action under this subsection directing such exclusion from entry, and upon receipt of such notice, the Secretary shall, through the proper officers, refuse such entry.

19 U.S.C. § 1337 (emphasis added). In the context of this dispute, the "articles concerned" would be, of course, the aforementioned "articles that . . . infringe a valid and enforceable United States patent," 19 U.S.C. § 1337(a)(1)(B)(i). Exclusion orders based on violations of § 337(a)(1)(B)(i) thus pertain only to the imported goods and are necessarily based on the infringing nature of those goods when imported.[3]

---

[3]     Certain provisions of § 337 do mention "any person violating the provision of this section," 19 U.S.C. § 1337(d), and the Commission can issue cease and desist orders to "any person violating this section," § 1337(f). This language, limits the remedies authorized by those provisions to reach only certain persons. *See Kyocera*, 545 F.3d at 1357. But it does not broaden the Commission's authority beyond the scope of § 337(a)(1)(B)(i), which prohibits only specified acts involving "articles that . . . infringe." Section 337(a)(1)(B)(i) does not reach parties' general culpable conduct that is not specified in the

The Commission has recognized this limitation on its jurisdiction by refusing to investigate complaints premised on allegations of direct infringement of method claims under § 271(a) because patented methods are not infringed until "use" in the United States occurs. *See In the Matter of Certain Electronic Devices*, Inv. No. 337-TA-724, 2012 WL 3246515, at *12–13 (ITC Dec. 21, 2011).

C.

To determine if imported goods are "articles that . . . infringe," we turn to the patent laws, specifically, § 271 of Title 35 of the U.S. Code. That provision defines unlawful patent infringement—i.e., the basis for the unfair trade practice regulated in 19 U.S.C. § 1337(a)(1)(B). Section 271 states:

> (a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

> (b) Whoever actively induces infringement of a patent shall be liable as an infringer.

> (c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such

section, even if that conduct eventually is related to acts of patent infringement following importation.

patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271.

Section 271(a) defines direct patent infringement and makes unlawful conduct tied to an article, namely, the making, using, offering for sale, and selling of a "patented invention." Section 271(c) defines contributory patent infringement, which again prohibits conduct tied to an article, but here, "a component of a patented machine, manufacture, combination or composition, or a material or apparatuses for use in practicing a patented process, constituting a material part of the invention." Section 271(b) defines induced patent infringement, and this provision, unlike the other two, declares unlawful conduct which is untied to an article—"actively induc[ing] infringement of a patent."

Precedent from our court makes evident the nature of § 271(b) and its focus on the conduct of the inducer. *See, e.g.*, *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) ("[I]nducement requires evidence of *culpable conduct*, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." (emphasis added)). We have stated, additionally, that "[t]o succeed [on a theory of induced infringement], a plaintiff must prove that the *defendants' actions* induced infringing acts and that they knew or should have known their actions would induce actual infringement." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) (emphasis added) (internal quotation marks and alterations omitted). For this reason, a large part of the inducement analysis and our case law dealing with the theory focuses on the intent of the inducer in performing the proscribed act. *See DSU*, 471 F.3d at 1304–06. Our

most recent en banc decision dealing with induced in-
fringement likewise makes clear the nature of the offense:
"[S]ection 271(b) extends liability to a party who advises,
encourages, or otherwise induces others to engage in
infringing conduct. . . ." *Akamai Techs., Inc. v. Limelight
Networks, Inc.*, 692 F.3d 1301, 1307–08 (Fed. Cir. 2012)
(en banc).

But the focus of the inducement analysis is not on the
conduct of the alleged inducer alone. "To prevail on
inducement, 'the patentee must show, first that there has
been direct infringement . . . .'" *Kyocera*, 545 F.3d at
1353–54 (quoting *Minn. Mining & Mfg. Co. v. Chemque,
Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002)). Under
that longstanding law, while the inducing act must of
course precede the infringement it induces, it is not a
completed inducement under § 271(b) until there has been
a direct infringement.

## D.

Given the nature of the conduct proscribed in § 271(b)
and the nature of the authority granted to the Commis-
sion in § 337, we hold that the statutory grant of authori-
ty in § 337 cannot extend to the conduct proscribed in
§ 271(b) where the acts of underlying direct infringement
occur post-importation. Section 337(a)(1)(B)(i) grants the
Commission authority to deal with the "importation,"
"sale for importation," or "sale within the United States
after importation" of "articles that . . . infringe a valid and
enforceable U.S patent." The patent laws essentially
define articles that infringe in § 271(a) and (c), and those
provisions' standards for infringement (aside from the
"United States" requirements, of course) must be met at
or before importation in order for the articles to be in-
fringing when imported. Section 271(b) makes unlawful
certain conduct (inducing infringement) that becomes tied
to an article only through the underlying direct infringe-

ment. Prior to the commission of any direct infringement, for purposes of inducement of infringement, there are no "articles that . . . infringe"—a prerequisite to the Commission's exercise of authority based on § 337(a)(1)(B)(i). Consequently, we hold that the Commission lacked the authority to enter an exclusion order directed to Suprema's scanners premised on Suprema's purported induced infringement of the method claimed in the '344 patent.[4]

E.

Cross Match points to a number of cases from our court and the Commission to argue that the Commission has the authority to entertain induced infringement claims. But the cases on which Cross Match relies do not squarely address the issue or are distinguishable. In *Kyocera Wireless Corp. v. International Trade Commission*, we reversed a finding of induced infringement by the Commission—because it failed to apply the "specific intent" requirement which, subsequent to the Commission's determination, we clarified in *DSU*—and remanded for reassessment under the correct legal standard. 545 F.3d at 1354. We assumed without deciding that the Commission had the authority to predicate a § 337 exclusion order on its finding of induced infringement by Qualcomm. There was no challenge to the Commission's

---

[4] We do not agree with the dissent that today's holding will materially impact the ITC's ability to carry out its mandate. Our holding is far narrower than the dissent asserts; as we explain, virtually all of the mischief the dissent fears can be addressed by the ITC via resort to § 271(a) or § 271(c), or even to § 271(b) where the direct infringement occurs pre-importation.

authority to predicate a violation on the theories urged.
Our holding was limited to the following:

> Because the Commission based its finding on an
> approach overruled by *DSU*, this court vacates
> and remands the ITC's determination of induced
> infringement. On remand, the ITC will have the
> opportunity to examine whether Qualcomm's con-
> duct satisfies the specific intent requirement set
> forth in *DSU*.

*Id.* at 1354. It is understandable, moreover, that the
parties and court in *Kyocera* did not focus on the Commis-
sion's authority to address inducement in the circum-
stances presented here (i.e., where no direct infringement
occurs until after the articles are imported). The facts in
*Kyocera* were very different.

In *Kyocera*, the Commission prohibited the importa-
tion of wireless communication devices "which when
programmed to enable certain battery-saving features
infringe the '983 patent," but the Commission only did so
with respect to manufacturers who "purchase[d] and
incorporate[d] Qualcomm chips into their mobile wireless
devices outside the United States, and then imported
them into the United States for sale." *Id.* at 1346. Thus,
while the infringement theory the Commission relied
upon in *Kyocera* was one of induced infringement, the
Commission's exclusion order was directed to articles
which, *when imported*, directly infringed the patents at
issue. Thus, this case differs significantly from *Kyocera*.

*Alloc, Inc. v. International Trade Commission*, 342
F.3d 1361 (Fed. Cir. 2003), also does not compel us to
reach a different conclusion here. In *Alloc*, in a brief
discussion we affirmed a Commission finding of no in-
duced infringement. But there was no challenge in that
case to the Commission's authority over inducement

claims, and we premised our holding on the fact that there simply was no evidence of either direct infringement—by anyone—or of an intent to induce by the importers:

> Here, the administrative judge found no evidence that the Intervenors intended to induce others to infringe the asserted patents. More importantly, the administrative judge found no evidence of direct infringement, which is a prerequisite to indirect infringement. *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1318 (Fed. Cir. 2003) ("Because this court upholds the verdict that claim 28 of the '494 patent is not directly infringed, the trial court correctly determined that FPS does not indirectly infringe that claim."); *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986) ("[T]here can be no inducement of infringement without direct infringement by some party."). This court finds no reason to disturb the administrative judge's conclusion on inducement.

*Alloc*, 342 F.3d at 1374. Thus, *Alloc* is uninformative with respect to the question presented here.

Simply put, the issue we address today has never been presented to or decided by us. We are unpersuaded by either Cross Match's or the Commission's efforts to read more into *Kyocera* and *Alloc* than is there. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38 (1952) ("[T]his Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio."); *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed. Cir. 1995) ("Stare decisis applies only to legal issues that were actually decided in a prior action.")

The parties also focus on a recent Commission ruling, *In the Matter of Certain Electronic Devices*, Inv. No. 337-TA-724 2012 WL 3246515, at *8–9 (ITC Dec. 21, 2011). There, the pertinent issue *was* raised. The Commission analyzed the statutory provisions we discussed above and concluded it has the authority generally to entertain indirect infringement claims:

> The plain language of [19 U.S.C. § 1337(a)(1)(B)] first identifies three specific acts that may form the basis of a violation of section 337: importation, selling for importation, and selling after importation. The statute then specifies, in list form, categories of articles that must be involved in the proscribed acts. First on the list are "articles that – infringe" a U.S. patent. *Id.* § 1337(a)(1)(B)(i). Because the statute specifies that the articles in question must "infringe," an importation analysis that ignores the question of infringement would be incomplete.

> The word "infringe" in section 337 derives its legal meaning from 35 U.S.C. § 271, the section of the Patent Act that defines patent infringement. Section 271 defines infringement to include direct infringement (35 U.S.C. § 271(a)) and the two varieties of indirect infringement, active inducement of infringement and contributory infringement (35 U.S.C. § 271(b), (c)). Thus, section 337(a)(1)(B)(i) covers imported articles that directly or indirectly infringe when it refers to "articles that – infringe." We also interpret the phrase "articles that – infringe" to reference the status of the articles at the time of importation. Thus, infringement, direct or indirect, must be based on the articles as imported to satisfy the requirements of section 337.

*Certain Electronic Devices*, 2012 WL 3246515, at *8–9. Despite this general discussion, on the merits, the Commission ultimately found no infringement:

> Thus, S3G might have proved a violation of section 337 if it had proved indirect infringement of method claim 16. S3G failed to do so, however, and we adopt the ALJ's findings to that effect. Because S3G has not shown importation, sale for importation, or sale after importation of articles that infringe method claim 16, directly or indirectly, S3G has not shown a violation of section 337 based on infringement of method claim 16.

*Id.* at *12–13; *see also id.* at *16 ("Because S3G has failed to prove indirect infringement of any asserted method claim, we reiterate that S3G has not shown a violation of section 337 with respect to claim 16 of the '146 patent."). We are not persuaded that the decision in *Certain Electronic Devices* counsels against the conclusion we reach today.

First, while the Commission spoke in terms of its authority to ban articles that infringe either directly or indirectly, it emphasized that the "articles" must infringe "at the time of importation." *Id.* at *9. For inducement, the only pertinent articles are those which directly infringe—at the time of importation. Hence, while the Commission may ban articles imported by an "inducer" where the article itself directly infringes when imported (as it attempted to do in *Kyocera*), it may not invoke inducement to ban importation of articles which may or may not later give rise to direct infringement of Cross Match's patented method *based solely on the alleged intent of the importer*. Second, the Commission's discussion of its authority to predicate a § 337 finding on an inducement claim in *Certain Electronic Devices* was dicta; ultimately, it did not resort to its purported authority

over such claims to fashion a remedy. And, the Commission's ruling, even if not dicta, would not be binding on us. Instead, we are bound by congressional intent, which is evident from the statutory language.[5]

## F.

Because we find the Commission had no authority to premise an exclusion order addressed to Suprema's scanners on the infringement theory it employed, we do not address the Commission's other findings on the '344 patent. Whether Mentalix directly infringes claim 19 of the '344 patent and whether Suprema induces that infringement are issues to be addressed by the only tribunal with authority to do so—the applicable federal court forum.

## III.

We turn next to Suprema's challenge to the Commission's finding that certain products Suprema imports (RealScan-10 and RealScan-10F) infringe claims 10, 12, and 15 of the '993 patent. The Commission adopted the ALJ's initial determination on these claims as its own. On appeal, Suprema challenges the ALJ's claim construction of a term appearing in the asserted claims, the infringement finding based on that claim interpretation, and the holding that Suprema failed to prove that the '993 patent would have been obvious.

## A.

The claim construction dispute involves the phrase "said second lens unit being on the image side of the first

---

[5]    Because we find congressional intent unambiguous, we decline to afford deference to the Commission's views on the precise question presented.

lens unit," as it appears in step (d) of claim 10 of the '993 patent, and the two other asserted claims, which both depend from claim 10. Specifically, Suprema argues that the claimed lens system[6] excludes "non-lens elements" and "off-axis optics" because those were disavowed in the written description of the '993 patent. So there can be no non-lens elements between the "lens units," Suprema believes, and the ALJ erred by not limiting the claims in this manner.

The ALJ did not separately analyze the language of step (d) but did construe the term "optical system," which appears in the preamble of claim 10 and the dependent claims. In its analysis of "optical system," the ALJ first found the preamble of claim 10 to be a limitation, *In the Matter of Certain Biometric Scanning Devices, Components Thereof, Associated Software, and Products Containing the Same*, Final Initial and Recommended Determinations, Inv. No. 337-TA-720, USITC Pub. 4366, at 24 (June 17, 2011) [hereinafter "Initial Determination"], and then held that "optical system" "could include non-lens elements, distortion correction prisms, holographic optical elements and off-axis optics," *id.* at 25. The ALJ looked to the written description for a disavowal related to the presence of non-lens elements in the "optical system," ultimately finding none. *Id.* at 26. Then, he stated the following:

> Based on said construction of "optical system" <u>supra</u>, the administrative law judge rejects respondents' arguments regarding the disavowal of non-lens elements and off-axis optics with respect to the other elements of claim 10 of the '993 patent.

---

6    Suprema uses "lens system" to refer to the three lens units and aperture stop recited in claim 10.

(RBr at 195-196.) Thus, he finds that the claim terms "first lens unit having a positive power," "between the aperture stop and the prism," "said second lens unit being on the image side of the first lens unit," and "third lens unit" are not precluded from containing non-lens elements, distortion correcting prisms, holographic optical ele-elements, or off-axis optics.

*Id.* at 27. The ALJ again rejected Suprema's arguments for disclaimer, first distinguishing case law which Suprema cited and then rejecting its arguments based on the written description. *Id.* at 28–32. The ALJ relied on, among other things, Suprema's concession that the "optical system" could include the purportedly excluded items and only the lens system could not; Suprema stands by that concession here. Ultimately, Suprema seeks a limitation excluding non-lens elements within the lens system because its products contain mirrors (i.e., non-lens elements) along with the lenses, so such a construction would lead to a finding of non-infringement.

Thus, Suprema concedes that non-lens elements can be included in the "optical system," as long as they are not located within the lens system. Suprema also seems to concede that the claim language does not exclude non-lens elements from being present in the lens system, i.e., between the first and second "lens units." Instead, Suprema relies on two passages in the written description to argue that non-lens elements cannot be present at that location. First, Suprema points to the patent's statements regarding the objects of the invention:

In view of the foregoing, it is an object of the invention to provide improved lens systems for use in fingerprint detection. In particular, it is an object of the invention to provide lens systems which employ only lens elements and do not employ dis-

tortion correcting prisms, holographic optical elements, or off-axis optics.

A further object of the invention is to provide inexpensive lens systems for use in fingerprint detection systems. In particular, it is an object of the invention to provide lens systems for use in fingerprint detection which comprise molded lens elements which can be produced in large quantities at low cost.

'993 patent col. 1 ll. 46–57. The "foregoing" language referred to is the "BACKGROUND OF THE INVENTION SECTION," on which Suprema also relies. That passage states:

A description of some of the problems involved in fingerprint detection using frustrated total internal refection can be found in Stoltzmann et al., "Versatile anamorphic electronic fingerprinting: design and manufacturing considerations," *SPIE*, Vol. 2537, pages 105–116, August 1995. These authors conclude that the optical system used to form the image of the fingerprint ridges should include prisms for correcting optical distortion. In practice, an optical system employing prisms is expensive to manufacture compared to an optical system employing only lens elements, both because prisms themselves are expensive and because collimating optics are required to avoid introducing aberrations.

Significantly with regard to the present invention, Stoltzmann et al. specifically teach away from the use of an optical system employing only lens elements to produce an image of fingerprint ridges. In particular, they state that a system employing cylindrical lenses cannot successfully

correct for high levels of horizontal/vertical compression.

As an alternative to distortion correcting prisms, Bahuguna et al., "Prism fingerprint sensor that uses a holographic optical element," *Applied Optics*, Vol. 35, pages 5242–5245, September 1996, describes using a holographic optical element to achieve total internal reflection without tilting the object (fingerprint ridges), thus allowing a rectilinear image of the object to be produced using only lens elements. The use of a holographic optical element, of course, increases the cost and complexity of the optical system.

Hebert, Robert T., "Off-axis optical elements in integrated, injection-molded assemblies," *SPIE*, Vol. 2600, pages 129–134, December 1995, describes another approach to the fingerprint detection problem, namely, the use of off-axis optics to avoid tilting the object. This approach requires the use of complex optical surfaces which are difficult to manufacture economically.

*Id.* col. 1 ll. 10–44.

Reading both passages together, it becomes evident that the concern which the patented invention addresses, and which is described in the first quoted passage above, is the use of costly means for correcting optical distortion. The prior art, according to the patent, achieves this correction with three alternatives, all of which are costly: prisms, holographic optical elements, and off-axis optics. The stated purpose of the invention, which forms the strongest basis for Suprema's arguments, says "it is an object of the invention to provide lens systems which employ only lens elements and do not employ distortion correcting prisms, holographic optical elements, or off-axis

optics." *Id.* col. 1 ll. 48–51. If anything is disclaimed by this statement, it is prisms, holographic optical elements, and off-axis optics, when either is used *as the means to correct distortion.*

We need not decide if this statement amounts to a clear disavowal of claim scope with respect to distortion correcting optics, however, a result that would require holding Suprema to a high burden. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("We have previously held that, in redefining the meaning of particular claim terms away from the ordinary meaning, the intrinsic evidence must clearly set forth or clearly redefine a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term. We have also stated that the specification must exhibit an express intent to impart a novel meaning to claim terms.") (citations and internal quotation marks omitted). Suprema's only non-infringement argument based on the disputed claim term is its assertion that *mirrors between the lens elements* in its products preclude a finding of infringement. But Suprema never contends that the mirrors correct distortion and it is unlikely that they serve this purpose; the mirrors seem instead to fold the optical axis to make the systems fit within their cases.

Accordingly, we conclude that the ALJ's infringement finding was supported by substantial evidence, as was the Commission's adoption thereof. Even assuming certain costly distortion-correcting devices were disclaimed and cannot be present in between "lens units," mirrors that do not correct distortion were not clearly disclaimed.

## B.

Suprema also challenges the ALJ's holding on its obviousness defense to the asserted claims of the '993 pa-

tent. Suprema argues that, in light of prior art U.S. Patent No. 3,619,060 ("the '060 patent") combined with prior art U.S. Patent No. 5,615,051 ("the '051 patent"), the asserted claims of the '993 patent would have been obvious to a person of skill in the art. The ALJ rejected this argument, first finding the '061 patent failed to disclose a three-lens unit as required by claim 10 of the '993 patent or a telecentric condition "in a lens located between the prism and the aperture stop as required by element c) of claim 10 of the '993 patent." Initial Determination at 116. The ALJ also rejected Suprema's argument that it would have been obvious to combine the triplet lens disclosed in the '051 patent into the device disclosed in the '060 patent, in order to render the asserted claims obvious, because the '051 patent, in the ALJ's view, also failed to disclose the required telecentric condition and Suprema adduced insufficient evidence regarding motivation to combine. *Id.* at 117–18. Accordingly, the ALJ found, among other things, that Suprema "failed to prove, by clear and convincing evidence, . . . that one of ordinary skill in the art would have been motivated to combine the asserted references." *Id.* at 118. That finding, we hold, was supported by substantial evidence. Accordingly, we affirm the ALJ's legal conclusion that Suprema "failed to establish, by clear and convincing evidence, that claim 10 of the '993 patent is obvious in view of the '060 patent in combination with the '051 patent." *Id.*

The '060 patent, entitled "Identification Device," issued on November 9, 1971. It generally discloses "identification devices and more particularly . . . a device which employs optical apparatus for comparing an object to be identified with a preselected image." '060 patent col. 1 ll. 3–5. One disclosed embodiment of the "identification device" is a finger print scanner comprising a light source, a prism, two lenses, a diaphragm, and a focal plane. *Id.*

col. 2 l. 74 – col. 3 l. 31.  This device is depicted in Figure 1 of the patent:



*Id.* Fig. 1.

The device is described as follows:

> The object to be identified, which may be a human finger on the hand of a person to be identified is positioned on the second face **22**, as at **26**.  The light beams **16** pass into the prism 18 perpendicularly to the face **20**, and an image is formed of the fingerprint because the light is reflected between points of contact between the finger and the second face.  The reflected light comes out through face **24** of the prism and is focused with an achromatic lens **28** through a diaphragm 30 onto an inclined focal plane **32**.

*Id.* col. 3 ll. 32–40.

"Acromatic lens 28" is the focus of the parties' argument, and the above-quoted passage is the only description of that lens contained in the '060 patent.  That is, no details regarding the "achromatic lens 28" are given, such as its structure or makeup.  This failure to provide "constructional data" for the achromatic lens, Suprema ar-

gues, provides motivation to combine the '060 patent with the lens system disclosed in the '051 patent.

Turning to that second reference, the '051 patent is entitled "Bright Triplet" and was issued on July 20, 1997. It discloses a novel "triplet," a three-lens triplet lens unit: "The present invention relates to a bright triplet and, more particularly, to a behind-the-stop type triple that has a wide field angle and is bright, so that it is well suited for use on photographic cameras." '051 patent col. 1 ll. 5–8. The structure of the disclosed triplet is described in detail. *See, e.g., id.* col. 1 l. 63 – col. 2 l. 7 ("According to one aspect of the invention, there is provided a bright triplet which comprises, in order from the object side, a first lens consisting of a positive single lens of glass in a meniscus form convex on the object side, a second lens located with an air separation between it and said first lens and consisting of a negative single lens of glass, a third lens located with an air separation between it and said second lens and consisting of a positive single lens of glass in a double-convex form, and an aperture stop located on the image side of said third lens, and in which at least two of said first to third lenses are provided with aspherical surfaces.").

We agree with the ALJ that the absence of "constructional data" regarding the achromatic lens disclosed in the '060 patent provides insufficient motivation for a person of skill in the art to seek out that data from the '051 patent, and that Suprema has shown insufficient evidence to substitute the triplet lens disclosed in the '051 patent for the "achromatic lens 28" of the '060 patent. As the ALJ noted, the only pertinent expert testimony provided by Suprema was that of its expert, Dr. Jose Manuel Sasian Alvarado, in which he stated:

Q. Why would they be motivated to do so [combine the '060 patent with the '051 patent]?

A. Because of the need to, to create a finger print system. The '060 patent doesn't disclose the con-structional data for the achromatic lens 28. So a person of ordinary skill would have the need to find what the achromatic lens that could be the triple of the '051 patent.

Q. Can you explain for me why the lens 28 would need to be replaced in the '060 patent?

A. Because, again, the '060 patent does not dis-close the construction of that, so a person needs to put a lens and then that person could very well use the triplet of the '051 patent, because they are well-known lenses.

(Tr. at 1280-81).

That a person of skill in the art "could very well" use the triplet of the '051 patent is insufficient reason for the skilled artisan to specifically seek out the unique lens disclosed in that reference. Moreover, the ALJ found that the '051 patent discloses a lens system that is well suited for "photographic cameras," not fingerprint scanners. That finding, we hold, was supported by substantial evidence. The '051 patent itself indicates that the lens it discloses "is well suited for use on photographic cameras." '051 patent col. 1. ll. 7–8. Thus, Suprema adduced insuffi-cient evidence of motivation to substitute the photograph-ic camera triplet lens of the '051 patent for the fingerprint scanner achromatic lens of the '060 patent. Moreover, since it gives no description of the achromatic lens' struc-ture, there is no indication that the achromatic lens of the '060 patent is a triplet lens or that a triplet lens would be suitable in its place.

Accordingly, we affirm the Commission's holding that Suprema failed to adduce clear and convincing evidence

that the asserted claims of the '993 patent would have been obvious to a person of skill in the art.

## IV.

For the reasons explained, we vacate the Commission's judgment regarding infringement of the '344 patent and vacate the limited exclusion order to the extent it was predicated on that finding. We affirm the Commission's holding that Suprema directly infringes the '993 patent, however, and leave intact the exclusion order regarding the RealScan-10 and RealScan-10F optical systems.

The scope of the exclusion order must thus be adjusted accordingly—it appears that only two of the previously identified products may be subject to the order.[7] Accordingly, we vacate the limited exclusion order and remand for proceedings in accordance with this decision.

## V.

We turn now to Cross Match's appeal regarding the '562 patent. The Commission fully adopted the ALJ's initial determination regarding this patent; the ALJ found that Cross Match failed to prove by a preponderance of the evidence that any Suprema accused product infringed the asserted claims of that patent. On appeal, Cross Match challenges the ALJ's interpretation of the term "capture" as it appears in the asserted claims of this patent and claims that the ALJ's improper construction of that term led to an incorrect non-infringement finding.

---

[7] The products found to infringe the '993 patent appear to be only RealScan-10 and RealScan-10F. Initial Determination at 168. But the products found to infringe the '344 patent are RealScan-10, RealScan-10F, RealScan-D, and RealScan-DF, when used with Mentalix's FedSubmit software.

Claim 1 is representative of the asserted claims and states:

A method for reliably capturing print images, comprising:

(a) initiating camera operation with a scanner

(b) scanning a biometric object to obtain a scanned image;

(c) processing the scanned image;

(d) determining print quality of individual print images in the scanned image;

(e) detecting prints in the scanned image; and

(f) determining whether the scanned image is ready for capture based on an expected number of print images detected in step (e) and the quality of the print images determined in step (d).

'562 patent col. 10 l. 59 – col. 11 l. 4.

Cross Match proposed to the ALJ that "capture" as used in the preamble to and step (f) of claim 1 means "acquiring, by the scanner, for processing or storage." Initial Determination at 59. The ALJ adopted this construction. *Id.* at 60. And, based on this construction, the ALJ concluded that Suprema's products do not infringe the asserted claims because they do not perform steps (d) and (e) before the image is "acquired . . . for processing or storage"—i.e., before it is deemed "ready for capture" and, ultimately, "captured."

Cross Match now suggests that the ALJ's construction of capture was wrong; it claims that "acquiring, by the

scanner, for processing or storage" does not require that the scanner perform all steps of the claimed "capturing" process. Instead, Cross Match argues that the scanner only need be *involved* in that process. Cross Match also contends that the scanner need only "keep" or "save" the image and that any "processing" thereof can be done by a computer. Based on these interpretations of what it means to "capture" an image, Cross Match contends the ALJ and Commission were wrong to conclude that all steps of claim 1 must be performed by a scanner for infringement to occur, and were wrong to conclude that step (f) of claim 1—the "determining whether the scanned image is ready for capture"—must occur after steps (e) and (d) have been performed.

In making these arguments, Cross Match puts itself in the difficult position of challenging a claim construction it proposed. *See Tessera Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1364 (Fed. Cir. 2011); *Key Pharma. v. Hercon Labs. Corp.*, 161 F.3d 709, 714–15 (Fed. Cir. 1998) ("We find highly questionable Hercon's assertion on appeal that the trial court erred when it adopted the very construction Hercon urged upon the court through the testimony of Dr. Guy. In essence, Hercon asserts that the trial court erred by adopting the position it advocated at trial. Although the function of an appellate court is to correct errors committed at trial, we look with extreme disfavor on Hercon's assertion that the trial court committed error in its claim construction. Ordinarily, doctrines of estoppel, waiver, invited error, or the like would prohibit a party from asserting as 'error' a position that it had advocated at the trial."). And, Cross Match is in the peculiar situation of asking for a construction of "capture" in the '562 patent which differs from that which it advocates for the same term in the '344 patent, even though the '562 patent incorporates by reference the '344 patent. Indeed, Suprema and the Commission ask that we resolve Cross

Match's appeal on these grounds, finding that it either waived any right to seek a different construction of the term "capture" before this court, or at least is estopped from doing so.

Cross Match contends it did not waive its right to make the arguments it develops here because it is not really asking for a new construction; it is simply debating how that construction should itself be construed. While Cross Match's position is a stretch—it really seems to be unhappy with the construction it proposed and to be asking for something directly at odds with that original construction—we need not rely on waiver to affirm the Commission's non-infringement finding on the '562 patent because we conclude that the Commission's finding on the merits was correct.

Specifically, we conclude that the ALJ's construction of the term "capture" is correct and that the ALJ was correct to conclude that the "capture" itself, and the preceding determination of whether the image is "ready for capture," in the claims of the '562 patent must occur before the scanned image is transferred to a computer. We also hold that the ALJ's infringement finding is supported by substantial evidence. The computer of the accused products performs the checks, i.e., steps (e) and (d), with software *at some point after* the computer receives the image from the scanner. So, in the accused products, those checks necessarily occur sometime after the scanner determines whether the image is "ready for capture."

There is no real dispute regarding the construction of "capture" since the ALJ adopted Cross Match's proposed construction. We adopt that construction as well: "capture" means "acquiring, by the scanner, for processing or storage." We also conclude that the ALJ was correct to conclude that, under this construction, step (f) necessarily

requires a determination of whether the "scanned image" is ready for "acquiring, by the scanner," *based on* the number and quality checks of steps (e) and (d). Given that claim language, as a matter of logic, those quality checks must precede the determination made under step (f), since that step is based on the results from the checks, and, since the scanner ultimately performs the capture, the preceding checks must be performed by the scanner or one of its components. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) ("We look to the claim language to determine if, as a matter of logic or grammar, [the steps of a method claim] must be performed in the order written.").

The claim language here plainly requires this construction. *See, e.g.*, '562 patent col. 11 ll. 1–4 ("determining whether the scanned image is ready for capture *based on* the number of prints detected in step (e) and the quality of the print image determined in step (d)." (emphasis added)); *id.* col. 11 ll. 24–36 (claim 4 adding to claim 1 steps of "(g) capturing the scanned image to obtain a captured image" and "(i) forwarding the captured image to a computer."). The written description of the patent also supports the view that "capture" is performed by the scanner and not by a separate computer. *Id.* col. 2 ll. 18–20 ("The method includes capturing the scanned image, processing the captured image, and forwarding the captured image to a computer."). A component of the scanner, such as software residing on a computer coupled to the scanner—which computer is part of the scanner—can perform the scanner's functionality, including the step (f) determination step. *See id.* col. 6 ll. 37–57 ("In an embodiment of the present invention, scanner **104** includes . . . a controller **116** [which] includes print capture manager **117**. . . . Control functionality . . . of print cap-

ture manager **117** [] can be carried out by . . . a computer coupled to the scanner.").[8]

Because it is undisputed that, in the accused products, the scanner has already transmitted the image to a computer when the purported number and quality checks are performed, the accused products cannot perform the method as claimed. Accordingly, we hold that the ALJ's non-infringement finding as to the '562 patent was premised on its correct construction of the term capture and understanding of the scope of claim 1. We affirm the Commission's ruling finding no violation of § 337 on grounds that no imported articles infringe the asserted claims of the '562 patent.

## AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART

---

[8] Cross Match makes a number of other arguments in support of its infringement claim. While we do not address each, we have considered them all and find them unpersuasive.

# United States Court of Appeals
# for the Federal Circuit

---

**SUPREMA, INC. AND MENTALIX, INC.,**
*Appellants,*

**v.**

**INTERNATIONAL TRADE COMMISSION**,
*Appellee,*

**AND**

**CROSS MATCH TECHNOLOGIES, INC.,**
*Intervenor.*

---

2012-1170

---

On appeal from the United States International Trade
Commission in Investigation No. 337-TA-720.

- - - - - - - - - - - - - - - - - - - - - -

**CROSS MATCH TECHNOLOGIES, INC.,**
*Appellant,*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

**AND**

**SUPREMA, INC. AND MENTALIX, INC.,**
*Intervenors.*

————————————

2012-1026, -1124

————————————

On appeal from the United States International Trade
Commission in Investigation No. 337-TA-720.

————————————

REYNA, *Circuit Judge*, concurring-in-part, dissenting-in-
part.

The majority concludes that the International Trade
Commission lacks authority to find a violation of 19
U.S.C. § 1337 ("Section 337") that is premised on induced
infringement where "the acts of underlying direct in-
fringement occur post-importation." Maj. Op. at 20.
While I agree with the majority's disposition of this case
in all other respects, I cannot join my colleagues' decision
to negate the Commission's statutory authority to stop
induced infringement at the border. Accordingly, I re-
spectfully *concur-in-part* and *dissent-in-part*.

I

This appeal arises out of an investigation into alleged
violations of Section 337 by Suprema (a Korean company)
and Mentalix (located in Plano, Texas). Suprema manu-
factures fingerprint scanners that it imports and sells for
importation[1] into the United States. To function, Su-

————————————

[1] The parties stipulated that Suprema imported
and sold for importation at least one unit of each accused
scanner, and that Mentalix imported and sold after im-
portation at least one unit of each accused scanner. *See
Certain Biometric Scanning Devices, Components Thereof,*

prema's scanners must be connected to a separate computer running special software. Suprema does not make or sell this software, but provides Software Development Kits (SDKs) that allow its customers to create their own software to operate the scanners. The SDKs include utilities that operate various functionalities of the scanners, and also include manuals instructing customers on how to use the SDKs. Mentalix, one of Suprema's customers in the United States, imports Suprema's fingerprint scanners and sells the scanners after importation, along with software to operate the scanners. Mentalix's software uses some of the functions included in Suprema's SDKs.

As relevant here, the Commission found that Suprema's scanners, when used with Mentalix's software, practice a patented method for capturing and processing fingerprints. The Commission found Mentalix liable for direct infringement for integrating its software with Suprema's scanners and using the integrated scanners in the United States. The Commission also found that Suprema actively aided and abetted Mentalix's infringement by collaborating with Mentalix to import the scanners and helping Mentalix adapt its software to work with the imported scanners to practice the patented method. Finding that Suprema willfully blinded itself to the existence of the patent and the infringing nature of the activities it encouraged, the Commission held Suprema liable for induced infringement under 35 U.S.C. § 271(b). Accordingly, the Commission issued a limited exclusion order banning from entry into the United States articles imported by Suprema or Mentalix that infringe the patented method. *See Certain Biometric Scanning Devices,*

---

*Associated Software, and Products Containing Same*, USITC Inv. No. 337-TA-720, Order No. 11 (Sep. 16, 2010).

*Components Thereof, Associated Software, and Products Containing Same*, USITC Inv. No. 337-TA-720, Pub. No. 4366, Limited Exclusion Order ¶ 1 (Feb. 2013).

## II

Instead of addressing the merits of the Commission's determination of induced infringement, the majority takes the unnecessary step of addressing the legality of the Commission's authority to conduct a Section 337 investigation that is based on allegations of induced infringement. The majority concludes that the Commission did not have authority to issue an exclusion order in this case because "the statutory grant of authority in § 337 cannot extend to the conduct proscribed in § 271(b) where the acts of underlying direct infringement occur post-importation." Maj. Op. at 20. According to the majority, the phrase "articles that – infringe" in Section 337 requires infringement at the time of importation, and because inducement is not "completed" until there has been direct infringement, the Commission may not invoke inducement to ban the importation of articles that are not already in an infringing state at the time of importation. *See id.* at 20, 25.

My problem with the majority's opinion is that it ignores that Section 337 is a trade statute designed to provide relief from specific acts of unfair trade, including acts that lead to the importation of articles that will result in harm to a domestic industry by virtue of infringement of a valid and enforceable patent. To negate both a statutory trade remedy and its intended relief, the majority overlooks the Congressional purpose of Section 337, the long established agency practice by the Commission of conducting unfair trade investigations based on induced patent infringement, and related precedent by this Court confirming this practice. In the end, the majority has created a fissure in the dam of the U.S. border

through which circumvention of Section 337 will ensue, thereby harming holders of U.S. patents.

A

For decades, the Commission has entertained complaints and found Section 337 violations where respondents actively induced direct infringement in the United States, infringement that did not occur until after importation of the articles involved.[2]  This Court has affirmed

---

[2]    *See, e.g.*, *Certain Inkjet Ink Cartridges with Printheads and Components Thereof*, USITC Inv. No. 337-TA-723, Pub. No. 4373 (Feb. 2013), Comm'n Notice at 3 (Oct. 24, 2011), Initial Determination at 79, 2011 WL 3489151, at *49 (Jun. 10, 2011); *Certain Digital Set-Top Boxes and Components Thereof*, USITC Inv. No. 337-TA-712, Pub. No. 4332 (Jun. 2012), Initial Determination at 132, 146, 2011 WL 2567284, at *76, *82 (May 20, 2011) (reconsideration granted on other grounds); *Certain Optoelectronic Devices, Components Thereof, and Prods. Containing Same*, USITC Inv. No. 337-TA-669, Pub. No. 4284 (Nov. 2011), Initial Determination at 51, 2011 WL 7628061, at *45 (March 12, 2010), *aff'd sub nom. Emcore Corp. v. Int'l Trade Comm'n*, 449 F. App'x 918 (Fed. Cir. 2011) (nonprecedential); *Certain Voltage Regulators, Components Thereof and Prods. Containing Same*, USITC Inv. No. 337-TA-564, Pub. No. 4261 (Oct. 2011), Enforcement Initial Determination at 38, 2011 WL 6980817, at *31 (Mar. 18, 2010) (violation of limited exclusion order based on inducement); *Certain Semiconductor Chips Having Synchronous Dynamic Random Access Memory Controllers and Prods. Containing Same*, USITC Inv. No. 337-TA-661, Pub. No. 4266 (Oct. 2011), Initial Determination at 42, 2011 WL 6017982, at *85 (Jan. 22, 2010); *Certain Digital Television Prods. and Certain Prods. Containing Same*, USITC Inv. No. 337-TA-617, Comm'n Op. at 10,

2009 WL 1124461, at *5 (Apr. 23, 2009), *aff'd in relevant part sub nom. Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330 (Fed. Cir. 2010); *Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chips, Power Control Chips, and Prods. Containing Same*, USITC Inv. No. 337-TA-543, Pub. No. 4258 (Oct. 2011), Initial Determination at 151, 2011 WL 6175074, at *83 (Oct. 10, 2006); *Certain Foam Masking Tape*, USITC Inv. No. 337-TA-528, Pub. No. 3968 (Aug. 2007), Initial Determination at 14-15, 2007 WL 4824257, at *20 (Jun. 21, 2005); *Certain Automated Mechanical Transmission Sys. for Medium-Duty and Heavy-Duty Trucks and Components Thereof*, USITC Inv. No. 337-TA-503, Pub. No. 3934 (Jul. 2007), Initial Determination at 154, 2007 WL 4473082, at *101 (Jan. 7, 2005); *Certain Display Controllers and Prods. Containing Same*, USITC Inv. No. 337-TA-491, Initial Determination, 2004 WL 1184745, at *116 (Apr. 14, 2004); *Certain Hardware Logic Emulation Systems and Components Thereof*, USITC Inv. No. 337-TA-383, Pub. No. 3154 (Jan. 1999), Comm'n Notice at 2 (Mar. 6, 1998), Initial Determination at 179, 1997 WL 665006, at *101 (Jul. 31, 1997); *Certain Concealed Cabinet Hinges and Mounting Plates*, USITC Inv. No. 337-TA-289, Initial Determination, 1989 WL 608804, at *48, *52 (Sep. 28, 1989); *Certain Minoxidil Powder, Salts and Compositions for Use in Hair Treatment*, USITC Inv. No. 337-TA-267, 1988 WL 582867, at *6-7 (Feb. 16, 1988); *Certain Molded-In Sandwich Panel Inserts and Methods for Their Installation*, USITC Inv. No. 337-TA-99, Pub. No. 1246 (May 1982), Comm'n Op. at 8 (Apr. 9, 1982), *aff'd sub nom. Young Eng'rs, Inc. v. Int'l Trade Comm'n*, 721 F.2d 1305 (Fed. Cir. 1983); *Certain Surveying Devices*, USITC Inv. No. 337-TA-68, Pub. No. 1085 (Jul. 1980), Comm'n Determination at 19, 0080 WL 594364, at *10 (Jul. 7, 1980).

Commission determinations of Section 337 violations that are premised on induced infringement.[3] Other decisions of this Court, while not affirming an exclusion order, recognized the Commission's authority to premise a Section 337 violation on a finding of induced infringement.[4] This rich history of longstanding agency practice and legal precedent is fruit borne of law enacted by Congress precisely to address importation of infringing articles by establishing relief at the point of importation, the border.

This Court has long recognized the Congressional purpose of Section 337 is to provide "meaningful relief available to patentees by enabling the ITC to issue exclusion orders to *stop infringement at the border.*" *John Mezzalingua Assoc., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1340 (Fed. Cir. 2011) (emphasis added). As originally enacted, Section 337 authorized the Commission to investigate unfair acts or practices in the importation of articles, including those related to infringement of U.S.

---

[3]    *See Vizio*, 605 F.3d 1330 (affirming violation in Inv. No. 337-TA-617 based on induced infringement of method claim); *Emcore*, 449 F. App'x 918 (affirming without opinion violation in Inv. No. 337-TA-669 based on induced infringement of apparatus claim); *Young Eng'rs*, 721 F.2d 1305 (affirming violation in Inv. No. 337-TA-99 based on contributory and induced infringement of process patents).

[4]    *See ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028 (Fed. Cir. 2009) (affirming finding of no direct infringement underlying inducement claims); *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340 (Fed. Cir. 2008) (reversing violation ruling after finding no intent to induce); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003) (affirming finding of no intent to induce).

patents, and placed on the President the authority to exclude such articles at the border. *See* Tariff Act of 1930, ch. 497, Title III, § 337, 46 Stat. 703 (1930).[5] In 1974, Congress expanded the Commission's authority by amending Section 337 to allow the Commission, itself, to order the exclusion of articles involved in unfair acts and practices. *See* Trade Act of 1974, ch. 4, Title III, § 341, 88 Stat. 1978 (1975). In 1988, with the intention to provide a "more effective remedy for the protection of U.S. intellectual property rights," Congress eliminated, with respect to investigations involving certain intellectual property rights, the domestic injury requirement contained in the prior version of Section 337. *See* S. Rep. No. 100-71, at 127-29 (1987); H.R. Rep. No. 100-40, pt. 1, at 154-56 (1987). Congress thus strengthened the role of the Commission in preventing unfair foreign competition by providing a more effective enforcement mechanism at the border. At no point in the Congressional development of Section 337 was the Commission's authority limited to only certain acts or practices that constitute infringement. Stated differently, the statute on its face authorizes the Commission to investigate all unfair acts or practices related to importation that are harmful to U.S. trade via infringement of a U.S. patent. There is no indication that Congress intended to prohibit the Commission from investigating acts of inducement leading to infringement. Had Congress intended such limitation, it would have amended Section 337 to so require. *See generally Whitfield v. United States*, 534 U.S. 209, 214 (2005) ("[I]f Congress had intended to create the scheme petitioners envision, it would have done so in clearer terms.").

---

[5] The provenance of Section 337 dates back as early as 1922. *See* Tariff Act of 1922, ch. 356, Title II, § 316, 42 Stat. 943 (1922).

The Commission's broad authority derives from the nature of the relief it is intended to provide. Exclusion at the border (and, in some cases, a cease and desist order directed at infringing articles already imported) is the only form of relief available in a Section 337 investigation. In this manner, Section 337 not only supplements the patent infringement remedies available in federal courts, it also provides a unique form of relief in patent law: preventing unfairly traded articles from entering the U.S. customs territory. Congress provided this broad remedy because it recognized that "[t]he importation of any infringing merchandise derogates from the statutory right, diminishes the value of the intellectual property, and thus indirectly harms the public interest." H.R. Rep. No. 100-40, at 154, 156. In other words, imported articles involved in unfair acts of infringement inflict injury on the U.S. industry and patent holders simply by virtue of importation, apart from any acts occurring after importation. Under Section 337, once the unfairly traded article is imported, the harm is done.

## B

The majority justifies a narrow reading of Section 337 by finding that proceedings at the Commission are focused "on the infringing nature of the articles at the time of importation, not on the intent of the parties with respect to the imported goods." Maj. Op. at 16. The majority misunderstands the *in rem* nature of proceedings at the Commission. Because the Commission has *in rem* jurisdiction over articles sold for importation, imported or sold after importation into the United States, it has the authority to exclude products *intended* to be sold or imported in the future by virtue of Congress's delegation of its power to regulate commerce with foreign nations and exclude unfairly traded merchandise from entry into the United States. *See Buttfield v. Stranahan*, 192 U.S. 470,

492 (1903). Thus, at least one instance of sale for importation, importation or sale after importation is required, and sufficient, to trigger the Commission's jurisdiction to investigate an alleged violation of Section 337. *See, e.g., Certain Trolley Wheel Assemblies*, USITC Inv. No. 337-TA-161, Pub. No. 1605 (Nov. 1984), Comm'n Op. at 8, 0084 WL 951859, at *4 (Aug. 29, 1984). But the Commission's authority to issue an exclusion order is more than *in rem* in nature because it incorporates an "*in personam* element," *see Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1357 (Fed. Cir. 2008), and is directed at future imported articles. Hence, the Commission's "focus" on articles is perfectly consistent with exclusion orders preventing future importation (and, in the case of inducement, future direct infringement) based on demonstrated instances of inducement and direct infringement in the United States.

Thus, while the Commission examines articles as they are imported to determine which infringement theory applies, it is not constrained by a requirement that the articles be in an infringing state when imported. Section 337 expressly applies not only to the moment of importation, but also, in the alternative, to sales occurring before and after importation that can give rise to infringement liability. An article that is not in an infringing state at the moment of importation can still form the basis of a Section 337 violation if its importation is tied to conduct giving rise to infringement liability.

The majority engages in protracted analysis to arrive at the view that 35 U.S.C. §§ 271(a) and (c) essentially define "articles that infringe" for purposes of Section 337 liability. *See* Maj. Op. at 20. According to the majority, inducing conduct does not "become tied" to an article until the underlying direct infringement happens. *See id.* I disagree. To the extent that the induced direct infringe-

ment involves an article, the inducing acts are tied to such an article at the time each act of inducement occurs. For purposes of Section 337, as long as the inducing acts include sale for importation, importation or sale after importation of articles involved in direct infringement in the United States, the inducing conduct is tied to "articles – that infringe" and the Commission has authority to investigate such conduct.

Contrary to the majority's holding, the reference in Section 337 to "articles – that infringe" does nothing to exclude induced infringement from the type of unfair acts Section 337 was designed to remedy. Section 337 is defined, much like § 271, in terms of *conduct* that may occur before and after the precise moment of importation. Because Section 337 is not by its terms confined to a specific time when the imported articles must "infringe," the majority errs in using § 271(a) and (c) to introduce a strict temporal limitation on the moment on which infringement liability must be "complete" for purposes of the Commission's authority to remedy violations of Section 337.

## III

I perceive the majority's holding in this case as enabling circumvention of the legitimate legislative objective of Section 337 to stop, at the border, articles involved in unfair trade. First, the majority's holding allows importers to circumvent Section 337 liability for indirect infringement. For example, an importer could import disassembled components of a patented machine, or import an article capable of performing almost all of the steps of a patented method, but reserve final assembly of the last part or performance of the last step for the end-user in the United States and, under the majority's holding, fall outside the Commission's statutory reach because direct infringement would not have occurred until after

importation. Yet, this Court has recently recognized that "there is no reason to immunize the inducer from liability for indirect infringement simply because the parties have structured their conduct so that no single defendant has committed all the acts necessary to give rise to liability." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1309 (Fed. Cir. 2012) (en banc). Likewise, an importer inducing infringement should not be able to escape liability by delaying direct infringement until after importation. The fact remains that "one who aids and abets an infringement is likewise an infringer." H.R. Rep. No. 82-1923, at 9 (1952). Section 337 should not be interpreted in a manner that enables this form of circumvention.

Second, the majority's holding allows importers to circumvent Section 337 liability for almost all forms of method patent infringement not involving product-by-process claims.[6] The Commission already declines to entertain complaints based on allegations of direct infringement of method claims under § 271(a), recognizing that a patented method is only infringed by "use" in the United States, which is not one of the types of conduct proscribed in Section 337. *See Certain Electronic Devices*, Inv. No. 337-TA-724, Comm'n Op. at 18-19, 2012 WL 3246515, at *12-13 (Dec. 21, 2011); 19 U.S.C. § 1337(a)(1)(B)(i) (making unlawful only the "importation," "sale for importation," and "sale within the United States after importation" of infringing articles). Given this existing limitation, the ability to file a Section 337 complaint based on theories of indirect infringement becomes even more important for owners of patented processes. But the majority now eliminates § 271(b) as a basis for finding a Section 337 violation, leaving only the

---

[6] Violations based on importation of articles manufactured abroad according to a patented process are separately codified in § 337(a)(1)(B)(ii), not at issue here.

possibility of enforcing method patents at the Commission under § 271(c) to the extent that the imported articles are especially made or adapted for use in practicing a patented method and are not capable of substantial noninfringing uses. Whether obtaining a remedy for this form of method patent infringement continues to be viable at the Commission remains to be seen, in light of the majority's broad holding that "there are no 'articles . . . that infringe' at the time of importation when direct infringement has yet to occur." Maj. Op. at 4.[7]

The majority's view also overlooks the practical realities of international trade. A common threat to trade relief in general is the modification of articles to place them outside the scope of relief orders, *e.g.*, exclusion or antidumping orders. These circumvention practices can be sophisticated and elaborate. Here, the majority legalizes the most common and least sophisticated form of circumvention, importation of the article in a disassembled state. The idea is that assembly within the United States removes the article from scrutiny and enforcement at the border. With regard to importation of articles whose assembly in the United States creates "articles – that infringe," while it is true that the patent holder may be able to sue in district court, it would likely face person-

---

[7]    Although the majority indicates that the § 271(c) "standards for infringement" can be met at the time of importation, it also holds that inducement is not "completed" until there has been direct infringement. *See* Maj. Op. at 20. Like inducement, liability for contributory infringement under § 271(c) requires a showing of direct infringement, which in the case of method claims will not occur until after importation. *See, e.g.*, *ERBE*, 566 F.3d at 1037 (affirming Commission's finding of no contributory or induced infringement where there was no evidence of direct infringement of method claim in the United States).

al jurisdiction and enforcement of judgment hurdles, and would certainly not be able to stop importation of the disassembled articles at the border. If anything, the majority's holding creates a new threat for U.S. patent holders.[8]

In my view, Section 337 was intended to provide distinct relief at the border to stop imports of articles that are used in unfair trade. I see no rational reason why this form of relief to U.S. patent holders should be eliminated when acts of inducement are involved. For purposes of Section 337 liability, I see no distinction between importing an article that meets all limitations of an apparatus claim as it crosses the border, and actively inducing infringement by importing an article and encouraging another to use that article to practice a patented method. In both cases, a patented invention is practiced within the country without authority as a result of importation. The majority is apparently concerned with the possibility that this interpretation could result in overbroad remedial orders that exclude articles that may or may not later give rise to direct infringement depending on the intent of the importer. *See* Maj. Op. at 25. But the Commission regularly includes a "certification provision" in its exclusion orders by which importers may certify that the articles they seek to import do not infringe and are there-

---

[8] The majority believes that its holding will not have adverse effects on the Commission's statutory mandate to provide specific relief from unfair trade practices, and points to § 271(a) and § 271(c) as obviating any need for relief, at the border, from induced infringement. *See* Maj. Op. at 21, n.4. As this dissent demonstrates, that is not the case. But even if it were so, it is up to Congress, not this Court, to repeal the Commission's mandate on grounds that sufficient relief is afforded elsewhere in the law.

fore not covered by the order. For example, the limited exclusion order issued against Suprema and Mentalix provides that "persons seeking to import biometric scanning devices . . . potentially subject to this Order may be required to certify that . . . to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order." *Certain Biometric Scanning Devices,* Limited Exclusion Order ¶ 3. I view the Commission as an international trade agency with the expertise and experience to fashion exclusion orders of appropriate scope.

In an appeal involving trade secret misappropriation, we recently held that the Commission may consider conduct abroad in determining whether imports related to that conduct violate Section 337. *See TianRui Grp. Co. v. Int'l Trade Comm'n,* 661 F.3d 1322, 1331-32 (Fed. Cir. 2011). Just as the panel in *TianRui* deemed it highly unlikely that Congress intended Section 337 not to reach instances in which the accused party was careful to ensure that the actual act of conveying the trade secret occurred outside the United States, I believe it is equally unlikely that Congress intended that Section 337 would not reach instances in which a respondent is careful to ensure that the actual act of direct infringement does not occur until the imports have entered the customs territory of the United States. The majority errs in concluding otherwise. Therefore, I must *dissent-in-part.*